IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ROARK M. JEFFRIES, | ) Civil No.: 3:10-cv-06426-JE |
| | ) |
| Plaintiff, | ) FINDINGS AND |
| | ) RECOMMENDATION |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

　　　　Kathryn Tassinari
　　　　Robert Baron
　　　　Harder, Wells, Baron & Manning, P.C.
　　　　474 Willamette, Suite 200
　　　　Eugene, OR 97401

　　　　　　　Attorney for Plaintiff

　　　　S. Amanda Marshall, U.S. Attorney
　　　　Adrian L. Brown, Asst. U.S. Attorney
　　　　1000 S.W. 3rd Avenue, Suite 600
　　　　Portland, OR 97204-2902

FINDINGS AND RECOMMENDATION - 1

Gerald J. Hill
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

      Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Roark Jeffries brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision of the Commissioner of Social Security (the Commissioner) denying his application for Social Security Disability Insurance Benefits (DIB) under the Social Security Act (the Act).

For the reasons set out below, the Commissioner's decision should be remanded to the Social Security Administration (the Agency) for consideration of the evaluation of an examining physician submitted after the ALJ had issued her decision.

**Procedural Background**

Plaintiff filed his first application for DIB on August 10, 2005, alleging that he had been disabled since August 4, 2005, because of a back fusion, removal of cartilage from his right knee, and limited use of two fingers in his left hand caused by a childhood injury. After that application was denied, he worked at a level constituting substantial gainful activity until February, 2008.

Plaintiff filed his present application for DIB on April 23, 2008, alleging that he had been disabled since February 15, 2008, because of knee and back surgeries and neck and hand injuries. He subsequently added that he had a nervous breakdown on August, 2008, after which

FINDINGS AND RECOMMENDATION - 2

he was easily distracted and could not concentrate.  After the application was denied initially and upon reconsideration, he timely requested a hearing before an Administrative Law Judge (ALJ).

A hearing was held before ALJ Ilene Kramer on November 5, 2009.  In a decision filed on December 7, 2009, ALJ Kramer found that Plaintiff was not disabled within the meaning of the Act.

In support of his request for review by the Appeals Council, Plaintiff submitted an evaluation performed by Dr. Robin Rose after the ALJ had issued her decision.  The Appeals Council considered Dr. Rose's evaluation, made it part of the administrative record, and concluded that neither it nor any of the issues raised by Plaintiff established that the ALJ had erred.  The ALJ's decision therefore became the final decision of the Commissioner on November 17, 2010, when the Appeals Council denied Plaintiff's request for review.  In the present action, Plaintiff seeks review of that decision.

## **Factual Background**

Plaintiff was born on November 23, 1967, and was 41 years old at the time of the ALJ's decision.  He stopped attending high school in his sophomore year, and later earned a GED.  He has past relevant work as a delivery driver, long haul truck driver, fast food worker and manager, warehouse worker, machine operator, and bench worker.

## **Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary

of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

     <u>Step One</u>.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

     <u>Step Two</u>.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

     <u>Step Three</u>.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

     <u>Step Four</u>.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

     <u>Step Five</u>.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that

FINDINGS AND RECOMMENDATION - 4

the claimant is able to do other work, the Commissioner must show that a significant number of

jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this

burden through the testimony of a vocational expert (VE) or by reference to the

Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the

Commissioner demonstrates that a significant number of jobs exist in the national economy that

the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this

burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  <u>Tackett</u>, 180 F.3d at

1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform

jobs that exist in significant numbers in the national economy.  <u>Id.</u>


### Medical Record

Plaintiff has a history of chronic pain problems.  Dr. Edward Ottenheimer, III, began

treating Plaintiff in April, 2003.  Dr. Ottenheimer's treatment records from 2004 and 2005

indicate that Plaintiff had some neuropathy in his legs, some general decreased sensation, and

some left arm dysesthesias.  In a letter dated September 21, 2005, Dr. Ottenheimer stated that

Plaintiff had undergone a laminectomy in 2003 which did not relieve his pain, and that Plaintiff

had experienced persistent back pain and radicular symptoms since that operation.  Dr.

Ottenheimer reported that Plaintiff's ability to bend and lift was extremely limited.  He stated

that Plaintiff's pain, which he characterized as debilitating,  severely limited Plaintiff's ability to

come to a standing position and to stand or walk for any prolonged period.  Dr. Ottenheimer

stated that he did not anticipate improvement "in the immediate or even long term future."

Plaintiff was evaluated at the Mercy Institute of Rehabilitation on February 20, 2006. Plaintiff reported that he had injured his back during two incidents at work on July 20, 2005, and that at the time of the evaluation he was working as a machinist in a position that required him to stand 6 to 8 hours a day and lift up to 20 pounds.  Radicular symptoms and reduced range of motion in the lumbar area were noted, and a treatment course including ultrasound, massage, electrical stimulation, and physical therapy was planned.  Chart notes dated May 24, 2006, indicated that Plaintiff was off work and reported a decreased tolerance for sitting and standing. Notes dated June 20, 2006, indicated that Plaintiff had returned to work, where he was "mainly performing paperwork duties," and that Plaintiff was performing light and moderate home and yard maintenance work.  Plaintiff  was discharged from physical therapy.

In January, 2007, Plaintiff sought medical marijuana treatment from the Alternative Medicine Outreach Program in Roseburg, Oregon.  Plaintiff was diagnosed with chronic lumbar strain with sciatica related to degenerative disc disease.

In March, 2007, Dr. Ottenheimer diagnosed Plaintiff with chronic back pain and depression secondary to chronic pain syndrome.

On September 5, 2007, Plaintiff sought treatment at an emergency room for a severe headache, stiff neck, photophobia, and blurred vision.  He reported that he had turned his head sharply while he was maneuvering a vehicle a few days earlier, and that his headache began about 30 minutes later.   A CT scan showed mild degenerative changes in Plaintiff's cervical spine.  Plaintiff was given a Toradol injection and a prescription for Percocet.

During a visit to Dr. Ottenheimer on September 17, 2007, Plaintiff reported that he had suffered a whiplash injury in a motor vehicle accident on September 2, 2007, when he "hit the brake pedal."  He reported that he had sought care for the injury in an emergency room, and had

FINDINGS AND RECOMMENDATION - 6

returned to work and performed normal duties following the accident, but had noticed increased

pain with sustained cervical flexion.  Dr. Ottenheimer noted asymmetry with cervical rotation,

and recommended physical therapy.

During an assessment for physical therapy on December 7, 2007, Plaintiff reported that

he experienced daily headache pain, and that his pain was exacerbated by work and recreational

activities.  A possible trigger point in the right upper trapezius was identified.  Plaintiff reported

that he was working with his employer to modify tasks and lessen the repetition and strain on his

neck and arms.

During a visit on January 21, 2008, Plaintiff told Dr. Ottenheimer that he needed more

pain medication.  Plaintiff said he thought that his condition had improved approximately 30%

with physical therapy, but that he continued to have mild to moderate headaches every day.  Dr.

Ottenheimer noted improved cervical flexion, but observed that Plaintiff's neck movement was

somewhat "rachet like" and not completely smooth.

On February 25, 2008, Plaintiff told Dr. Ottenheimer that his neck pain was worsening.

Dr. Ottenheimer diagnosed radiculopathy of the cervical spine.  He referred Plaintiff for a

cervical MRI which revealed cervical spondylosis at C6-7 and C5-6 with mild right-sided

foraminal encroachment at C6-7 and mild left-sided foraminal encroachment at C5-6.   Dr.

Ottenheimer noted  "some evidence of nerve compression" on the MRI, and referred Plaintiff to

Dr. Rees Freeman, a neurosurgeon.  In an evaluation dated March 31, 2008, Dr. Freeman noted

that Plaintiff had earlier undergone a hemi-laminectomy at L4-5 and a hemi-partial laminectomy

at L5-S1, with re-exploration of the L5-S1 area in 2006.  Dr. Freeman concluded that the MRI

upon which the referral was based showed disc herniation at C6-7 and "osteophytic with disk

material compromising the foramina at exit and the neural element in passage C5-6 right side."

He noted that Plaintiff had been "taken off work" and subsequently laid off and had no medical

insurance coverage.  Plaintiff told Dr. Freeman that, after paying for physical therapy and

"conservative measures,"  he had $9,000 left from insurance payments related to his accident.

He said he had been told that the hospital charge for neck surgery would be approximately

$51,000.

Plaintiff told Dr. Freeman that he was in constant pain, which was exacerbated by leaning

over, lifting, pushing, pulling, and/or extending his chin to the front.  He said that improvements

from physical therapy were transient, and that he was depressed, tired, and worn out by his

situation.  Dr. Freeman observed that Plaintiff demonstrated "no affect pathology and/or

overlay" during the examination.  He noted that Plaintiff had decreased sensation in the first,

second, third, and fourth digits of his right hand, and that the biceps and triceps on his right side

appeared to be weak.  Dr. Freeman opined that there was acute damage to the C7 and C6 nerve

roots and disc herniation evident on C6-7 on the right side and osteophytic intrusion into the

foramina at C5-6 on that side.  He stated that he planned to excuse Plaintiff from work for a

month and a half and obtain EMGs.  Dr. Freeman opined that Plaintiff was a candidate for

surgery because he had not improved with prolonged physical therapy and conservative

treatment, and noted that Plaintiff did not have insurance or the resources needed to cover the

cost.  Dr. Freeman signed a letter asking that Plaintiff be excused from work for medical reasons

from March 31, 2008, to May 15, 2008.  In a letter dated May 12, 2008, Dr. Freeman requested

that the release from work be extended from May 15, 2008, until June 2, 2008.

An electro-diagnostic study that Dr. Steven Goins carried out on May 15, 2008 showed

right C7 radiculopathy with denervation of right C7 muscles and a borderline abnormality of the

right medium nerve at the wrist segment.  Dr. Goins opined that the results were consistent with

Dr. Freeman's diagnosis of a right C7 nerve root injury. He noted that the evaluation was somewhat limited because Plaintiff's pain prevented reliable muscle strength testing, but thought that Plaintiff's upper extremity reflexes were normal. Dr. Goins reported that there was a markedly positive Spurling sign that reproduced pain into Plaintiff s right third and fourth fingers.

During an office visit on June 2, 2008 to discuss the results of the EMGs, Plaintiff told Dr. Freeman that he was moving better but continued to experience moderate to severe pain in his neck, shoulders, and arms, had continuous pain down his right arm into the fingers on his right hand, low back pain, had pain in his legs and feet, and had frequent to constant numbness all over his body. Plaintiff reported that he and coworkers at his previous workplace were experiencing myalgias, aching pains, numbness and tingling which Plaintiff thought was related to the use of aerosolized kerosene at the facility. Dr. Freeman noted that Plaintiff's MRI showed a disc herniation at C6-7 which was consistent with Plaintiff's symptoms. Dr. Freeman was concerned about the possible long term effects of continued nerve root compromise, but noted that Plaintiff lacked funds needed for surgery and wanted to try epidural steroid injections instead. He opined that Plaintiff was improving, although he still demonstrated "very apparent pathology consistent with" the examination results noted above.

Dr. Freeman noted that C7 radiculopathy was determined clinically, electrophysiologically, and by MRI, and stated that Plaintiff's motor dysfunction was "apparent." He indicated Plaintiff should be excused from work for medical reasons from June 2, 2008 to October 1, 2008.

Dr. William Smith, a neurosurgeon, performed an independent medical examination of Plaintiff on July 14, 2008. Plaintiff told Dr. Smith that he was gradually improving over time

and was not eager to undergo surgery, but that he had lost his job as a machinist because of his pain and physical limitations.  Plaintiff said he was taking 4 to 8 Oxycodone per day for pain relief, and that he slept poorly.  Dr. Smith reported that Plaintiff had good motor strength in all muscle groups and in both upper extremities and had good strength and symmetrical reflexes in his lower extremities.  He indicated that Plaintiff reported no weakness in his right arm.

Dr. Smith noted that Plaintiff had a diagnosis of an acute herniated disc on the right at C6-7, and attributed the disc condition to Plaintiff's accident on September 3, 2007.  He did not think that Plaintiff was medically stationary.  Dr. Smith opined that Plaintiff was slowly improving, had no neurologic deficits, and would not need surgery if he continued to improve. He thought that surgery to remove the disc protrusion would be reasonable if Plaintiff's condition worsened or stabilized at an unsatisfactory level.  He thought it unlikely that Plaintiff could return to work as a machinist in his condition at the time of the examination.

During a visit on August 28, 2008, Plaintiff told Dr. Ottenheimer that he could not have surgery because of insurance problems, and requested Xanax and Oxycontin to manage his pain. Dr. Ottenheimer authorized refills of Plaintiff's prescriptions for these medications, and indicated that he would monitor Plaintiff's medications closely.

In a record of Plaintiff's visit on December 9, 2008, Dr. Ottenheimer indicated  that he had seen Plaintiff for a followup of his chronic pain syndrome.  Dr. Ottenheimer stated that Plaintiff continued to be disabled because of neck, back, and knee injuries.  Plaintiff told Dr. Ottenheimer that he thought he might be able to return to work in early January.  Dr. Ottenheimer provided him a release, effective January 2, 2009, indicating that Plaintiff could work up to 8 hours per day "as tolerated."

FINDINGS AND RECOMMENDATION - 10

On April 22, 2009, Dr. Ottenheimer wrote a "to whom it may concern" letter setting out his evaluation of Plaintiff's physical abilities. The letter stated that Plaintiff

> has been unable to perform light or sedentary activities with any duration. His endurance is limited to only a couple of hours. It is noted that he has been unable to perform these activities for an extended period in a day, significantly less than eight hours, perhaps more in the range of four hours with frequent breaks. These physical impairments are a result of chronic back pain syndrome. This has evolved following some work-related injuries in the distant past. He has undergone three back surgeries. He is also limited by some chronic neck pain as a result of work-related injuries exacerbated by a whiplash injury in a motor vehicle accident.

> In addition to the aforementioned problems, he had a work-related injury involving his right knee in 1999. This resulted in two knee surgeries related to the meniscus. His current knee problems are intermittent but are significant when they occur. They are exacerbated by prolonged standing and walking.

In a visit on August 29, 2009, Plaintiff told Dr. Ottenheimer that he continued to have chronic back pain. Dr. Ottenheimer wrote that "overall," Plaintiff was "doing well." He added that Plaintiff continued to have "disability-related issues with his back." Dr. Ottenheimer diagnosed hypertension and chronic back pain.

In a letter to the ALJ dated November 5, 2009, Dr. Ottenheimer stated that he had given Plaintiff the work release noted above so that Plaintiff "could continue to seek unemployment benefits." He stated that Plaintiff "was and is quite limited in his ability," and opined that Plaintiff was not "able to function even for a limited number of hours." Dr. Ottenheimer apologized for "any confusion" the release may have caused, and told the ALJ that he appreciated her assistance "in finding this gentleman to be medically disabled."

On January 14, 2010, approximately five weeks after the ALJ issued her decision finding that Plaintiff was not disabled within the meaning of the Act, Plaintiff was examined by Dr. Robin Rose. Dr. Rose also reviewed Plaintiff's medical record and the ALJ's decision. Dr. Rose reported that Plaintiff walked very stiffly, limped, and used his arms to propel himself, and

that his knee bend was 55% of normal and was limited by pain and spasm.  Plaintiff used a cane,

which he said his doctor had approved, but not prescribed.  Plaintiff's straight leg raising was

positive in both a seated and supine position, and his Romberg test was negative.  Grasping was

completely intact on the right, and was decreased on the left because of a deformity of the fifth

digit.  Plaintiff had some difficulty gripping and holding objects securely to the palm by the last

three digits and manipulating large and small objects with the first three digits.  Dr. Rose

reported that she observed cervical and lumbar paravertebral muscle spasms with palpable

tenderness, cervical crepitus, and deformity manifested as diminished lordosis.  Plaintiff's motor

strength was 5/5 in the upper extremities and 4/5 in the lower extremities.  His sensitivity to

vibration was decreased in the lower extremities bilaterally and his two-point discrimination was

diminished in his feet.

Dr. Rose diagnosed lumbar disc disease with persisting chronic pain status post recurrent

interventions with a neuropathic pain in the lower extremities; cervical disc disease with

radiculopathy; right knee pain status post meniscectomy and left knee instability with strain;

chronic occupational hydrocarbon exposure, sustained without protective gear without sufficient

toxicology evaluation; and flexion contraction of the left hand with right fifth finger contracture.

She opined that Plaintiff's radiculopathy required intervention.

Dr. Rose opined that, during an 8 hour workday, Plaintiff could be expected to stand and

walk two to three hours if he could take breaks every 30 minutes to change position; and could

sit for 3 to 4 hours with breaks to change position every 30 minutes.  She attributed these

limitations to lower extremity neuropathic pain and lumbar disc disease, and low back pain and

spasm complicated by chronic knee pain.  Dr. Rose opined that Plaintiff's use of a cane was

medically necessary for long distances and uneven terrain, based upon objective medical

FINDINGS AND RECOMMENDATION - 12

findings.  She found that Plaintiff could lift 15 pounds frequently and 25 pounds occasionally, could occasionally reach non-repetitively, could not perform repetitive tasks with his arms and legs, could perform activities involving gross manipulation less than 1/3 of a workday, and could perform fine motor activities non-repetitively for less than 1/3 of a workday.  Dr. Rose opined that the large doses of narcotic pain medications that Plaintiff took interfered with his ability to process complex information, move briskly, and remain prompt, and thought he would likely experience pain that would cause him to miss work more than two days a month.  Dr. Rose questioned whether neurotoxicity was a complicating factor.  She indicated that Plaintiff was compliant with treatment to the extent that he could afford it, and recommended a psychological evaluation.

Plaintiff submitted Dr. Rose's evaluation to the Appeals Council in support of his request for review.  The Appeals Council considered the evaluation and made it part of the Administrative Record, but concluded that it did not provide a basis for altering the ALJ's decision.

## Testimony

### Plaintiff

Plaintiff testified as follows at the hearing before the ALJ.

Plaintiff did not have insurance and could not afford the surgery that Dr. Freeman recommended.  He had problems with his left hand and did not have use of his left pinky and ring fingers.  Since his automobile accident, he had experienced numbness in his right arm and into his ring finger, index finger, and middle finger.  If he sat in one position for more than 10 or 15 minutes, Plaintiff's right hand would start to go numb, making it difficult for him to hold

things.  He dropped things, and did not think that he could use his hands more than 2 hours during an 8 hour day.

Plaintiff's headaches, which could last a day or two,  were debilitating, and prevented him from driving or concentrating.  He stayed in bed when he had severe headaches.

After standing for 10 to 15 minutes, it was difficult for Plaintiff to avoid moving around. He also needed to move around after sitting for 15 to 20 minutes.  Plaintiff  had been drawing unemployment benefits, and did not think that he could work full time even at a lighter duty position than he had held before.  He had to lie down for 4 or 5 hours every day, and his need to lie down increased when he was more active.  Though Plaintiff needed to lie down more when he was more active, he needed to lie down some of the time because of pain even if he was not. active.

Plaintiff's abilities had diminished severely since he was injured in 2005.  He could focus on simple tasks for 20 to 40 minutes during an average hour, and then needed to lie down and take more medication.  He did not sleep through the night.

Plaintiff experienced numbness or tingling in both legs, predominately on the right.  He was unable to get out of bed on some days, and had been in bed for two full days a few days before the hearing.  He stayed in bed for most of the day 3 or 4 days a week, partly because of depression.  Plaintiff thought that he had had an emotional breakdown in June or July, 2008, around the time of his divorce.  Plaintiff had not seen anyone for mental health counseling, but would if he had insurance.

**<u>Vocational Expert</u>**

The ALJ asked the VE to consider a hypothetical individual with plaintiff's age, education, and experience who was limited to sedentary work; could lift or carry 10 pounds

occasionally and less than 10 pounds frequently; could stand and walk with normal breaks for 2 hours and sit for 6 hours during an 8 hour workday; would need a sit/stand option to change positions with a moment to stretch without walking away from the job; would need to change position every 30 minutes to an hour; could push and pull occasionally with the upper extremities; could occasionally balance, stoop, and crouch; could never kneel or crawl; could occasionally reach overhead bilaterally; could only occasionally finger with the left non-dominant hand; needed to avoid exposure to extremes of heat, cold, or vibration; needed to avoid working around hazardous machinery and unprotected heights; and was limited to simple, routine, repetitive tasks because of the side-effects of narcotic medications.  The VE testified that the described individual could not perform plaintiff's past relevant work, but could work as a dowel inspector, a call out operator, or a surveillance system monitor.

  The ALJ next asked the VE to consider the effect of Dr. Ottenheimer's limitation to a 4 hour workday.  The VE testified that this restriction precluded competitive employment.

  In response to questioning by Plaintiff's counsel, the VE testified that an individual who was limited to occasional handling or grasping could not work as a dowel inspector, but could perform the other positions he had cited.  He also testified that an individual who needed to lie down to rest at will or who missed two or more days per month could not perform these jobs, and that a limitation to occasional bilateral handling and fingering would significantly reduce the occupational base in sedentary positions.  The VE testified that a call out operator would be required to keep a log or use his hands to keep track of calls, and that an individual who could work only 50 minutes out of every hour because of the side-effects of medication could not sustain employment.

FINDINGS AND RECOMMENDATION - 15

**ALJ's Decision**

At the first step of her analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability on February 15, 2008.

At the second step, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar and cervical spine, chronic pain syndrome, obesity, and depression secondary to chronic pain.

At the third step of her analysis, the ALJ found that, alone or in combination, Plaintiff's impairments did not meet or equal a presumptively disabling impairment set out in the "listings," 20 C.F.R. Part 404, Subpart P, Appendix 1.

Before proceeding to the fourth step, the ALJ evaluated Plaintiff's residual functional capacity (RFC). She found that Plaintiff retained the capacity required to work at the sedentary exertional level with the following limitations: Plaintiff needed the option to change positions from sitting to standing as needed every 30 to 60 minutes; could only occasionally push and pull with the upper extremities, climb ramps or stairs, balance stoop, reach overhead, and finger with the non-dominant left hand; could never kneel or crawl; could tolerate no more than moderate exposure to extreme cold, extreme heat, or vibration; and could perform only work involving simple, routine, repetitive tasks. The ALJ found that Plaintiff's descriptions of his symptoms and limitations were not credible to the extent that they were inconsistent with this assessment.

At the fourth step, the ALJ found that Plaintiff could not perform his past relevant work.

At the fifth step of her analysis, based upon the testimony of the VE, the ALJ found that Plaintiff could do "other work" that existed in substantial numbers in the national economy. The ALJ cited dowel inspector, call-out operator, and surveillance system monitor jobs as examples

of work that Plaintiff could perform.   Because she found he could perform "other work," the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

## Discussion

FINDINGS AND RECOMMENDATION - 17

Plaintiff contends that the ALJ failed to adequately support her rejection of the opinions of her treating physician, erred in concluding that he was not wholly credible, and erred in concluding that he could perform "other work" at step five.  He also contends that the Commissioner's denial of his request for review was incorrect in light of the evaluation of Dr. Rose that was submitted to the Appeals Council after the ALJ had filed her unfavorable decision.

For the reasons set out below, I have concluded that this action should be remanded to the Agency so that an ALJ may consider Dr. Rose's evaluation.  This conclusion arguably makes it unnecessary to consider Plaintiff's other arguments.  However, I will review the ALJ's rejection of certain of Dr. Oppenheimer's opinions because these, if credited, would require a finding of disability and render further consideration of Dr. Rose's assessment moot.  I will not address the ALJ's assessment of Plaintiff's own credibility, or Plaintiff's contention that the ALJ erred in concluding that he could perform "other work," because an ALJ could view these issues differently in light of Dr. Rose's evaluation, and assessment of her opinions is, in the first instance, a matter for the ALJ.

1. **Evaluation of Plaintiff's Treating Physician**

In November, 2005, Dr. Oppenheimer opined that Plaintiff's pain was debilitating.  In 2009, Dr. Oppenheimer opined that Plaintiff was "severely limited," and could bend and lift only a few pounds for a short time.  He opined that, taking frequent breaks, Plaintiff could work no more than 4 hours per day.  This limitation would, of course, preclude competitive employment. In addition to these opinions, in later 2008, Dr. Oppenheimer released Plaintiff to work up to 8 hours per day "as tolerated" as of January 2, 2009.  As noted above, he later explained that he had provided the release so that Plaintiff could continue to seek unemployment benefits.

Plaintiff contends that the ALJ failed to provide adequate reasons supporting her rejection of Dr. Oppenheimer's opinion that Plaintiff's limitations were disabling.

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions.  Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995).  An ALJ must provide "specific and legitimate" reasons, which are supported by substantial evidence in the record, for rejecting the opinion of a treating physician that is contradicted by the opinion of another physician.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  An ALJ may reject the opinion of a doctor that is not supported by the record as a whole, including clinical findings and treatment notes.  See, e.g., Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).  An ALJ may also reject a doctor's opinion that is based upon a claimant's subjective complaints that are properly discredited.  Batson v. Commissioner, 359 F.3d 1190, 1195 (9th Cir. 2004).

Dr. Oppenheimer's opinion that Plaintiff could work no more than 4 hours a day was contradicted by his release permitting Plaintiff to work up to 8 hours, as tolerated, as of January 2, 2009.  It was also inconsistent with the opinion of Dr. Smith.  Dr. Smith opined that Plaintiff had not returned to his "preloss activities" and thought that Plaintiff could not return to his work as a machinist.  However he clearly thought that Plaintiff's impairments were less severe than those described in Dr. Oppenheimer's letters of April 22 and November 5, 2009, and opined that Plaintiff's condition was continuing to improve.

Dr. Ottenheimer's opinions upon which Plaintiff relies were contradicted by other medical opinion, including his own opinion reflected in the release to work he signed in late

2008. Therefore, the ALJ was required to provide specific and legitimate reasons, supported by the record, for rejecting Dr. Ottenheimer's assertion that Plaintiff's impairments were disabling.

The ALJ rejected those opinions on the grounds that Dr. Ottenheimer was not wholly credible. This is a specific and legitimate basis for rejecting medical opinions, and the ALJ cited substantial evidence in the record supporting her evaluation of Dr. Ottenheimer's credibility. The ALJ noted that Plaintiff had engaged in substantial gainful activity for several years after Dr. Ottenheimer had described his limitations as debilitating, and cited specific evidence in the record supporting her observation that he seemed to give Plaintiff "whatever type of letter" he asked for without investigating changes in his medical condition. The ALJ noted that Dr. Ottenheimer acknowledged that he had signed a release indicating that Plaintiff could work up to 8 hours a day so that Plaintiff could continue to seek unemployment benefits, and later asserted that Plaintiff could not in fact work more than 4 hours a day at the time of the release. She also cited Dr. Ottenheimer's medical records which indicated that Plaintiff's condition was improving and suggested that he was less impaired than Dr. Ottenheimer opined in his most recent letter describing Plaintiff's limitations. The ALJ provided the support required to reject Dr. Ottenheimer's opinion as to the disabling severity of Plaintiff's impairments. See e.g., Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (ALJ may reject physician's opinion that is contradicted by another opinion of same physician, or is not supported by the physician's notes and findings).

## 2. Dr. Rose's Evaluation

As noted above, after the ALJ issued her decision, Dr. Rose reviewed Plaintiff's medical records, examined Plaintiff, and assessed Plaintiff's functional capacity. The Appeals Council

considered Dr. Rose's evaluation and made it part of the record, but concluded that it did not

provide a sufficient basis for altering the ALJ's decisiona

Where, as here, the Appeals Council has considered new material submitted after an ALJ

issued a decision, the new material becomes part of the administrative record which the district

court must consider in determining whether the Commissioner's final decision is supported by

substantial evidence. Brewes v. Commissioner, WL 2149465 at *4 (9th Cir., June 14, 2012)

(citing Ramirez v. Shalala, 8 F.3d 1444, 1451-52 (9th Cir. 1993); Lingenfelter v. Astrue, 504 F.3d

1028, 1030 n. 2 (9th Cir. 2007); Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000)).

Accordingly, I have considered Dr. Rose's post-decision evaluation in my review of the

administrative record.

The question here is whether, having considered an administrative record that includes

Dr. Rose's evaluation, the district court should affirm the Commissioner's decision, remand the

action for an award of benefits, or remand the action for further proceedings.  The Ninth Circuit

has concluded that an action may be remanded for payment of benefits without additional

proceedings where "the record has been fully developed and further administrative proceedings

would serve no useful purpose."  Id. (quoting Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir.

1996)).  However, it has also noted that resolving conflicts and ambiguities in the record is the

ALJ's responsibility, e.g., Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989), and that

further administrative proceedings are generally appropriate if the ALJ has not had the

opportunity to consider significant additional evidence.  See, e.g., Harman v. Apfel, 211 F.3d

1172, 1180 (9th Cir. 2000) (not appropriate to remand for an award of benefits based upon

"evidence that the ALJ has had no opportunity to evaluate").

Dr. Rose's assessment provides substantial support for Plaintiff's assertion that he is disabled. The assessment is consistent with Plaintiff's own description of his limitations and with some of the evidence in the medical record, including the opinion of Dr. Freeman, a neurosurgeon. An ALJ who credited Dr. Rose's assessment might conclude, as the ALJ here did not, that Plaintiff's description of the severity of his impairments and functional limitations was wholly credible. Dr. Rose's assessment is also significant because the VE testified that a claimant who missed two or more days of work per month because of his medical condition, as Dr. Rose found Plaintiff would, could not maintain competitive employment. An ALJ who fully credited Dr. Rose's evaluation would be required to find that Plaintiff is disabled.

Under the guidance of the decisions cited above, I conclude that this action should be remanded for further proceedings. Though Dr. Rose's evaluation supports Plaintiff's assertion that he is disabled, the ALJ cited other material in the record which did not. Under these circumstances, an ALJ should have the opportunity to resolve any conflicts between Dr. Rose's assessment and other evidence in the record. On remand, an ALJ should consider Dr. Rose's evaluation, and should be required to reassess Plaintiff's RFC, credibility, and ability to perform "other work" at step five of the disability analysis as necessary in light of that consideration.

## Conclusion

A Judgment should be entered REVERSING the Commissioner's decision and REMANDING  this action to the Agency for further proceedings. The Judgment should provide that, on remand, an ALJ shall consider Dr. Rose's report and reconsider any issues concerning Plaintiff's RFC, credibility, and ability to perform "other work" that are relevant in light of the ALJ's evaluation of Dr. Rose's opinion.

**<u>Scheduling Order</u>**

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due July 30, 2012.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 11th day of July, 2012.


_____/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge

FINDINGS AND RECOMMENDATION - 23